80 So.2d 332 (1955)
John IPPOLITO and Gaspar Lamont, Appellants,
v.
STATE of Florida, Appellee.
Supreme Court of Florida. En Banc.
March 4, 1955.
Rehearing Denied June 1, 1955.
Wm. C. Pierce and Manuel M. Garcia, Tampa, for appellants.
Richard W. Ervin, Atty. Gen., and Moie J.L. Tendrich, Asst. Atty. Gen., for appellee.
HOBSON, Justice.
Defendants Ippolito and Lamont appeal from a judgment of the Hillsborough County Criminal Court of Record entered upon a verdict of guilty of unlawfully being interested in a lottery and possessing lottery materials. At the trial, the evidence disclosed the following basic facts relevant to the questions here sought to be raised:
On a Saturday morning, Constable Prevatt, his assistant, Hawrsk, and one Wallace, Prevatt's brother-in-law (who was not an officer) were riding in a borrowed unofficial car (a green Cadillac bearing an Orange County license plate) within the Tampa city limits. They were dressed in plain clothes, but armed with pistols. Appellant Lamont was driving his car, a black Ford, and Ippolito was a front-seat passenger therein. Appellants were unarmed. The officers had previously seen *333 Ippolito enter Lamont's car, carrying something which looked like a shoe box.
The officers followed the Lamont car at a discreet distance until it reached a stop street. Prevatt testified that the Lamont car did not stop. Hawrsk testified that he did not know whether the car stopped or not. The officers caught up with Lamont's car two blocks beyond the stop sign, pulled up alongside it, and Hawrsk shouted at Lamont. Constable Prevatt testified that his sole purpose in attempting to stop the Lamont car was "to reprimand them for running that stop sign." We observe at this point that the State failed to prove that the street in question had theretofore been designated by proper authority as a stop street. Lamont failed to stop, and a chase ensued through the Tampa city streets, with appellants traveling between 55 and 60 m.p.h. in a residential section, at times going into private yards, and once hitting a parked car. The chase lasted 10-15 minutes, and the officers fired three shots in an effort to stop the appellants, who finally stopped when their car hit a fence, whereupon Ippolito got out and ran (carrying brown envelopes in his hands according to Prevatt's testimony; Hawrsk did not know what he carried). Hawrsk and Wallace tackled Ippolito from the rear, and all three hit the ground together. Lamont stayed in his car, and Prevatt kept him covered with a pistol. Lamont and Ippolito were handcuffed and searched, but nothing was found on their persons. In the rear seat of Lamont's car, Prevatt found a cardboard box of small unsealed plain envelopes. Hawrsk found near the bushes where Ippolito had been thrown to the ground several objects which were not identified or identifiable as lottery paraphernalia until appellants had been arrested and taken to jail where the objects were examined.
Both appellants contend that the seizure of this evidence was unreasonable under the Florida Constitution, Declaration of Rights § 22, F.S.A., and its admission was consequently error. Appellant Lamont contends that the evidence against him was at all events insufficient to sustain his conviction. Because of the view we take of the case it is necessary to consider only the first point raised.
When questioned regarding his use of a non-official car, Constable Prevatt testified that he was "in disguise" and that he "wasn't out there in [his] automobile that they all know." There was thus a deliberate design to conceal his official status. The record is by no means conclusive as to whether or not the occupants of the Lamont car, and particularly Lamont himself, were ever apprised of the identity of two of the Cadillac's three passengers as officers of the law. Prevatt's plan to conceal his identity may have been entirely successful up to the time when the Lamont vehicle reached its final stopping place.
When the officers' car pulled up alongside the Lamont car just beyond the stop sign, Hawrsk shouted "Constable's office. Pull over." Both cars were in motion at the time, and traffic coming from the opposite direction made it necessary for Prevatt to fall back in line behind Lamont, whereupon, according to both Prevatt and Hawrsk, Ippolito turned around in the seat and appeared to wave. Immediately thereafter, the chase commenced, but it is not clear from the record whether the Lamont vehicle was being driven in excess of the speed limit before the shooting started. According to Hawrsk's testimony on cross-examination:
"Q. I mean, the really excessive speed was after the shots were fired? A. The real wild chase happened after we got on the sand road, but where he was going down Armenia Avenue where we first tried to stop him, he gained a little speed and at the intersection he cut and we were right after him and when he cut into the dirt street he was cutting down one and down the other and it was all over the whole, all over West Tampa, in that part there.
"Q. And the sand road is where the shots were fired, isn't that correct?

*334 A. That's right. At the time I shot it looked like he jumped about ten feet. The car just kept going faster."
In this inconclusive state of the record a theory consistent with innocence of any unlawful conduct was available, namely, that Lamont first saw the unfamiliar, unofficial car when it pulled up alongside him, that the officers were not recognized by either of the appellants, that the shout of Hawrsk during the brief time the cars were opposite each other was not heard, was misunderstood, or was considered insufficient to amount to a bona fide official command to stop, that Lamont feared foul play from strangers and thought only of escape, and that the shots which were improvidently fired tended to confirm his suspicion and caused him to increase his speed, with the results we have outlined above. This was not a case where "the wicked flee when no man pursueth", since there was no doubt that the appellants were being hotly pursued. There is no real proof that Ippolito, the passenger of Lamont, actually recognized the officers, and if he did, he may not have told Lamont, or if he did recognize the officers and tell Lamont, the significance of his message might have been lost to Lamont in the excitement of subsequent events. It was not proved that Lamont knew any of the Cadillac's occupants.
We have no difficulty in finding a "search" here. The materials found in the bushes were apparently thrown or knocked from Ippolito's person by the acts of violence perpetrated upon him by Hawrsk and Wallace. Upon this point the case is distinguishable from Mitchell v. State, Fla., 60 So.2d 726, where the package retrieved by the officers was voluntarily thrown into the brush. If there is any substantial difference in law between obtaining evidence by a peaceful search and by violence, this difference must operate in favor of the appellants herein.
Under the peculiar circumstances of this case, we think that the Constitution of Florida was violated, and the search was unreasonable. The independent major traffic violation which would have justified appellants' apprehension, Brown v. State, Fla., 46 So.2d 479; Longo v. State, 157 Fla. 668, 26 So.2d 818, was apparently caused by the deliberate acts of the officers themselves, which savor very strongly of entrapment if they do not actually amount to a species thereof. The practice of officers patrolling the streets "in disguise" in unofficial cars is not to be encouraged, not because it is not "sporting", for Anglo-American jurisprudence during the past hundred years has been more and more firmly and commendably opposed to any sporting theory of justice, but because it gives rise to problems of the type before us and may well involve innocent persons in wild chases, endangering life and property. We cannot condone these ill-advised acts of violence which, for aught that appears, were entirely caused by the officers themselves.
Reversed.
MATHEWS, C.J., and TERRELL, J., concur.
BARNS, J., concurs specially.
ROBERTS and DREW, JJ., dissent.
SEBRING, J., not participating.
BARNS, Justice (concurring specially).
I concur. Section 22 of the Declaration of Rights of the Constitution, F.S.A. provides that "the right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches, shall not be violated". No search warrant was issued and it is doubtful that the facts known before arrest were sufficient to justify the issuance of a search warrant if that course had been pursued. The arrest cannot justify the search and in turn the search justify the arrest. See Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436.