PIERCE, Judge.
Appellant (defendant) Freddie Lee Mc-Dougal was informed against for the offense of manslaughter, allegedly committed in the driving of an automobile in a culpably negligent manner, resulting in the death of one James Krupp, who was a passenger in another automobile with which defendant’s car collided. Upon trial, the jury convicted, and from the judgment of conviction defendant has appealed to this Court. Although numerous grounds were asserted in the Motion for New Trial filed pursuant to the verdict, and also in the Assignments of Error filed here, having to do with procedures at the trial, the sole point argued in this Court and urged here for reversal is the sufficiency of the evidence to sustain the jury’s verdict.
The record before this Court discloses a bizarre state of facts. J. P. Lersh, an officer for over 18 years with the City of St. Petersburg Police Department, was engaged in making an official call at 653 Jordan Park, which is in a colored residential section of St. Petersburg. He was in a police vehicle known as an accident van, painted the green and white colors of the City Police Department, with the City seal on it and with a large red light overhead. With him was James R. Price, another St. Petersburg police officer, and together they were investigating a reported disturbance at the address stated, at about 9 o’clock P.M. on April 15, 1964. At least one or two other police cars were there on the same call, all the vehicles being parked out in front of the residence. Officers Lersh and Price had already been in the house for about five minutes, had come out and had gotten into their police vehicle preparatory to leaving, with officer Lersh in the driver’s seat, when a 1960 red Ford convertible, with defendant McDougal driving, drove by at a normal rate of speed. There was no one in the car with defendant, according to both officers. Shortly thereafter, the red Ford came back going westerly in the opposite direction, at which time the officers fell in behind the Ford and started following it. Then followed a most irrational course of driving on the part of defendant; crossing, criss-crossing, zigzagging, weaving and *541 skidding up and down, over and across, numerous of the narrow and irregular streets, avenues, alleys and dirt roads in that part of the city. He accelerated his speed from about 25 to 30 miles an hour, to about 70 to 80 miles per hour, or, as one witness, Mi's. Loretha Yates, who was sitting in a chair on her fi'ont lawn near the end of its meanderings, testified, 85 to 90 miles per hour. Defendant never went in a straight line more than a few blocks at a time, mostly turning at every corner or every other corner, completely ignoring cross intersections and even stop streets.
When the officers first fell in behind defendant, he was going west on 13th Avenue. About three quarters of a block away defendant turned south on 25th Street, going one block to 14th Avenue, then turning west on 14th Avenue. The officers were then about five car lengths behind defendant. He drove one block on 14th, then turned north on Yale Street; then proceeded on Yale some six or seven blocks, part of which was only a sand road. The officers estimated Yale Street was 22' wide where paved and only about 17' wide in the sand. Defendant finally turned off Yale east on 9th Avenue, going one block to 25th Street, where he turned north one block to 8th Avenue. The officers by that time were about half a block behind the other car. Defendant then turned east on 8th Avenue, which was a sand street, to 24th Street, where he turned north one block to 7th Avenue, where he turned two blocks west to 26th Street. The officers were by that time about three-quarters of a block behind defendant. The streets in that area were described by the officers as being “sandy and very rough.” At 26th Street defendant turned south one or two blocks to Harrington Street, where he turned east two blocks to 24th Street. He turned north on 24th Street two blocks to 7th Avenue, turning west at that point one block to 25th Street, turning south on 25th three blocks to 9th Avenue. He then turned west on 9th Avenue one block to 26th Street. Describing the terrain of these streets the officers testified “this whole area is sand * * * no paved roads from 9th Avenue * * * all rough.” 26th Street is a paved road and defendant drove straight for eight or nine blocks to 15th Avenue to the point of impact with the car in which deceased was riding, during which eight or nine blocks defendant accelerated his speed from about 35 to 40 miles per hour up to 75 to 90 miles per hour, depending upon the estimates in the sworn testimony of the various witnesses.
During all his driving as related, defendant never stopped or slowed down until the fatal crash, heeding neither dirt roads, rough roads, narrow roads, right angle turns, or stop streets. The first corner defendant turned after the officers started following him, from 13th Avenue into 25th Street, was a stop street for all traffic to stop before entering 25th Street. Thereafter, defendant blandly went on, without stopping or slowing down, into and across the following stop streets: from Yale Street into 9th Avenue, making a right turn; on 25th Street going into 9th Avenue, where he made a right turn; on 9th Avenue, making a right turn into 26th Street; and from 26th Street going into 15th Avenue, where traffic is supposed to stop going into 15th Avenue. This was the point of the fatal collision. For the last approximately eight or nine blocks on 26th Street the officers had attained a speed of from “75 to 80 miles an hour” by their speedometer and the defendant was “pulling away from us.” At such speed defendant barged into 15th Avenue without stopping, crashing into a Fair-lane, which was also a City of St. Peters-burg police car, wherein officer James Krupp was riding as a passenger along 15th Avenue. He was killed instantly. The entire “wild ride” had covered an area of 35 blocks, all within a 30 mile speed zone, during which time defendant had driven into and across stop streets at least five times, all of them displaying red and white stop signs prominently, before entering. Officer Lersh had his “red lights on” and *542 his siren sounding from shortly after the ■chase began.
The foregoing are the highlights of the events transpiring on this night of “travel and travail” leading up to the final scene •of carnage.[1] The case for the State was abundantly put in evidence by the sworn testimony of eleven State witnesses, through •313 pages of testimony, with 46 exhibits •being offered and admitted, most of which were enlarged photographs of scenes and ■streets along which defendant drove, particularly street intersections, showing raised, tmetal stop signs, etc.
Against such an array of evidence, the defendant was his own sole witness. Defend•ant McDougal, a 21 year old white man, testified he had gone “to see a colored boy •about a car, and a police cruiser passed us. * * And I went and turned, and he turned the same way I did, and I cut two •or three blocks, and he had cut two or three blocks, and he didn’t — just kept on following ■me. * * * I made several turns, and then turned back and stuff, and I seen he was •still following me, he didn’t make no effort to stop me or catch me. * * * I tried to turn again, and see if he’d follow me, and 'he still followed. * * * Then I got scared ** * * I started accelerating, I imagine.” He did not recall seeing a single stop sign, •did not see any red light on the pursuing ■vehicle, and didn’t hear a siren. He re•called intersections as he made turns, but never looked at his speedometer. Asked •about the fatal collision at 26th Street and 15th Avenue, he testified “I don’t never remember getting to that intersection.” Such was the essential portions of the defendant’s testimony.
The question before this Court is: Did defendant McDougal operate his Ford convertible on that night in such a culpably negligent manner as to be criminally responsible for the killing of officer Krupp. We think so.
The case of Cannon v. State, 91 Fla. 214, 107 So. 360, has been for the past forty years considered the pilot case in Florida regarding the kind and degree of negligence necessary to sustain a manslaughter conviction in such cases. The trial Court in the Cannon case defined to the jury the requisite negligence to be—
“The omission to do something which a reasonable, prudent, and cautious man would do, or the doing of something which such a man would not do, under the circumstances of a particular case.”
The giving of this charge was held by the Supreme Court to be reversible error for the reason that, while it was a correct definition of simple negligence such degree of negligence could not be the basis for a manslaughter conviction under the culpable negligence statute. It was held that such negligence, to constitute manslaughter, must be such as—
“ * * * to authorize the recovery of exemplary or punitive damages, (and that) the negligence complained of must be of ‘a gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a con *543 scious indifference to consequences, or which showed wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.’ (Cases cited). This definition of the character of negligence necessary to be shown to authorize the recovery of punitive damages may well be applied as a definition of ‘culpable negligence’ is used in the statute (now F.S. Section 782.07, F.S.A.) defining manslaughter.” [2]
Consequent upon the foregoing general language in Cannon, there was a period of seeming judicial uncertainty as to just what did or did not constitute culpable negligence in the individual cases where convictions were appealed.[3] The facts constituting alleged culpable negligence were perforce different in each case and the Courts were apparently reluctant to affirm because of the admittedly high degree of proof necessary.
Especially was this true in cases where speed was the predominant factor in proof of culpable negligence. This resulted in the reversal of a line of cases where speed was the overpowering, dominant factor involved. See Preston v. State, Fla.1952, 56 So.2d 543; Russ v. State, 140 Fla. 217, 191 So. 296; Miller v. State, Fla.1954, 75 So.2d 312; and Smith v. State, Fla. 1953, 65 So.2d 303. There even evolved a sort of legal sophism that “speed alone is not sufficient to convict.”[4] The fallacy, however, was and is, not in the statement itself, which is in the literal sense true, but rather in the application of it to the facts in a given case— or for that matter in any case, for the simple reason that in every case there inevitably exist facts and circumstances which commingle with the element of speed and must be considered with it.
And so it was that this legal myth was in time judicially noticed and discarded. Henderson v. State, Fla.1956, 90 So.2d 447; Johnson v. State, Fla.1957, 92 So.2d 651, and Fulton v. State, Fla.1959, 108 So. 2d 473, are prime examples.
In Henderson the Court said:
“Relying on our definition of ‘culpable negligence’ in Cannon v. State, 91 Fla. 214, 107 So. 360, appellant contends that the evidence showed only *544 excessive speed. He then asserts that under Miller v. State, Fla.1954, 75 So. 2d 312, excessive speed alone is insufficient to sustain a conviction of manslaughter for a homicide resulting from the operation of an automobile. It is ’"iie that in Miller v. State, supra, we held that a speed of 40 to 45 miles per hour under the circumstances there evident was not sufficient, standing alone, to sustain the manslaughter conviction. However, we there pointed out that one rate of speed may well be reckless and sufficient to constitute culpable negligence under some circumstances while the same rate under other circumstances would not fall in that category. Koger v. Hollahan, 144 Fla. 779, 198 So. 685, 131 A.L.R. 886. Likewise, in Preston v. State, Fla.1952, 56 So.2d 543, we held that excessive speed alone is not necessarily culpable negligence sufficient to sustain a charge of manslaughter. In the same case wc pointed out that the proof of excessive speed coupled with other circumstances could be sufficient to show a reckless disregard for the safety of others sufficient to sustain a conviction.”
And in Johnson, the Court said:
“When the mounting carnage on the highways is challenging the thought of every serious-minded official directly or indirectly concerned with enforcement of the law, a situation of which we take judicial notice, we should review the decisions of this court dealing with speed as an element of culpable negligence to see if we have held unqualifiedly, as now suggested to us, that excessive speed will not alone suffice to prove a defendant guilty of culpable negligence.
“We are referred to the opinion in Russ v. State, 140 Fla. 217, 191 So. 296, in which the court rejected the contention of the State that excessive speed was sufficient to establish culpable negligence but did so because of other evidence about the familiarity of the victim with the place where the accident occurred, and her failure to observe approaching traffic or exercise proper care for her own safety.
“In Preston v. State, Fla., 56 So.2d 543, 544, after repeating the definition of culpable negligence, we referred to speed as an element of the offense in these words: ‘ * * * excessive speed alone is not necessarily culpable negligence sufficient to sustain a charge of manslaughter.’ (Italics supplied). This decision was cited in Maxey v. State, Fla., 64 So.2d 677.
“In Smith v. State, Fla., 65 So.2d 303, 305, the pedestrians were struck by a car that was passing through a rural area at the rate of 60 or 65 miles per hour. The highway was four lanes in width, the surface was dry and the night was clear. True, the court said that ‘[sjpeed alone (was) not sufficient to sustain a conviction’ but the statement cannot be lifted out of context and applied to all situations. It was a pronouncement restricted by the other relevant facts of the particular case.
“The illogic that would result from taking the simple statement out of that decision and adopting it here regardless of the other circumstances is inescapable. * * *
“It cannot be stated as an absolute rule that speed alone cannot amount to manslaughter. Too much depends on the attendant circumstances. A person might drive all day long at 60 miles an hour through the country without being caught in the toils of the law, but could he proceed with any such sense of propriety past a school as children were flowing into his path?”
In the Fulton case the appellant relied upon the cases of Cannon, Jackson [Jackson v. State, Fla., 100 So.2d 839], Miller *545 and others. Justice Terrell disposed of such contention in the following language:
“I have read these cases but I think they are predicated on such different circumstances that they cannot be said to control the case at bar. In fact if this court has ever prescribed a pattern or formula for the determination of culpable negligence, it had reference to the particular case and was not intended to be general. No such formula could be general because so many and different factors may be involved in culpable negligence. There is nothing mystical about culpability. It comprehends blame, censure or some aspect of erratic conduct. To support manslaughter as used in § 782.07, Florida Statutes, F.S.A., one’s conduct must reveal a reckless disregard or indifference for the life, safety or rights of those exposed to its effects, or it must show an indifference to consequences regardless of who is affected. If one takes no account of the fact that others are on the highway and have as much right to be there as he has or is totally oblivious to their rights, his conduct may be culpable.”
The instant case lies well within the orbit of the cases last cited. Defendant was in a colored residential neighborhood where the streets were more unpaved than paved, largely sandy, rough and narrow. He accelerated his speed from the normal rate of 30 to 35 miles per hour to 70 or 80 miles per hour. One witness even estimated his speed just before the fatal impact at 85 to 90 miles per hour. He drove with reckless abandon across stop streets at least five times without stopping or slowing down, tie turned numerous corners at ninety degree turns. He testified he did not either observe the red lights on the pursuing vehicle or hear the siren sounding.
The defendant’s entire testimony was heard, considered, and obviously discounted, by the jury. It is not for us to evaluate it here. Such is not our responsibility. It is the exclusive prerogative of the jury, within which sphere we will not transgress, much less speculate. It is obvious from the entire record that the jury “disbelieved” his testimony as being “much too thin,” to use the language of Justice Thomas in Hunt v. State, Fla.1956, 87 So. 2d 584.
As summarized by Justice Terrell in Fulton v. State, supra:
“It is accordingly shown that appellant wilfully violated the rules of the road; that his conduct revealed a reckless disregard for the right of the deceased on the highway and that he was oblivious to her presence there. There was ample predicate for the verdict and judgment.”
Defendant cites the cases of Frank v. State, 121 Fla. 53, 163 So. 223, and Ippolito v. State, Fla.1955, 80 So.2d 332. The writer is personally familiar with both these cases, but neither is apposite here. The Frank opinion was concerned solely with insufficiency of circumstantial evidence, whereas the evidence in the instant case was wholly direct, not circumstantial. Ippolito concerned the legality of what was found in the accused’s automobile after it was overtaken by a police car, whereas here no evidence was even offered as to anything found in defendant’s car as a result of the pursuit.
The conclusion reached by Justice Terrell in Fort v. State, Fla.1956, 91 So.2d 637, is apropos here:
“ * * * appellant’s conduct revealed gross and flagrant negligence, such reckless disregard of human life and such want of common care and courtesy as to raise a presumption of conscious indifference to the result. He exhibited such careless disregard *546 of the safety of others that the jury could not have reached a different verdict.”
The judgment appealed from is therefore—
Affirmed.
SHANNON, Acting C. J., and LILES, J., concur.

. Concerning the condition, immediately after the collision, of the police Fair-lane wherein deceased Krupp was riding, officer Lersh testified: “The car was — -the initial impact was on the right front. The hood was knocked off, the gas tank was knocked out of it. The windshield was knocked out of it. The radio was broken .loose from its mounting brackets, and between the two passengers — the two people that ride in the front seat of the car. There was damage on the right front where it struck the pole, or the left side. There was damage to the right rear where the two cars, after the initial impact, had slammed together in the rear as they then proceeded on their separate ways. Officer Krupp was hanging by his seat belts out with his head against the curb. The door buckled, and was open, and he was laying with his head out on that side.”

. F.S. see. 782.07 F.S.A. (then Section 5039, R.G.S.): “The killing of a human being by the act, procurement or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder * * * shall be deemed manslaughter * *

. Thus in Austin v. State, 101 Fla. 990, 132 So. 491, the Court said: “We do not think that criminal liability attaches where circumstances and conditions beyond the control of the accused caused him against his will to be in a position and under the conditions which resulted in the unfortunate death of the child.” And in Hulst v. State, 123 Fla. 315, 166 So. 828, the Court held: “Generally a crime has two elements, the overt act and the criminal intent; but in statutory manslaughter the element of criminal intent has been supplanted by the statutory element of ‘culpable negligence’.” And in Russ v. State, infra, in reversing, stress was laid upon the fact that the deceased was contributo rily negligent in walking across the highway that she had personal knowledge was dangerous. And in Pitts v. State, 132 Fla. 812, 182 So. 234, and Walter v. State, 157 Fla. 684, 26 So.2d 821, convictions were reversed upon insufficiency of the evidence without discussing the evidence involved. And in Graives v. State, 127 Fla. 182, 172 So. 716, after first unanimously affirming the conviction, the Court reversed upon rehearing, only, however, when a necessary fourth Judge concurred in the conclusion to rnoarú, a new trial “in order to avoid affirmance of judgment by equal division of court.” All these involved convictions for manslaughter based upon culpable negligence in the driving of an automobile.

.A similar contention is made in defendant’s brief filed in the instant ease: “ * * * speed alone is not conclusive of culpable negligence ***.*** this fact alone is not necessarily sufficient to sustain a charge of manslaughter * *