907 So.2d 676 (2005)
STATE of Florida, Appellant/Cross-Appellee,
v.
Adam Lucas JACOBY, Appellee/Cross-Appellant.
No. 2D04-1409.
District Court of Appeal of Florida, Second District.
July 29, 2005.
*677 Charles J. Crist, Jr., Attorney General, Tallahassee, and Susan D. Dunlevy, Assistant Attorney General, Tampa, for Appellant/Cross-Appellee.
Robert E. Puterbaugh of Peterson & Myers, P.A., Lakeland; and J. Davis Connor of Peterson & Myers, P.A., Winter Haven, for Appellee/Cross-Appellant.
R.W. Evans of Allen, Norton & Blue, P.A., Tallahassee, for Amicus Curiae Florida, Sheriffs Association.
DAVIS, Judge.
The State challenges the trial court order suppressing certain evidence that was gathered at the scene of a single-vehicle accident in which the vehicle's passenger was killed. The driver of the vehicle, Adam Lucas Jacoby, cross-appeals the trial court's denial of his request to suppress the remaining items of evidence. We affirm in part, reverse in part, and remand for further proceedings.
The facts of this case are very troublesome. Between 2 a.m. and 3 a.m. on May 31, 2002, Jacoby and his passenger, Miles White, were traveling in Jacoby's mother's vehicle in Polk County on Country Club Road, east of Winter Haven. Sergeant Scott Lawson of the Polk County Sheriff's Office was on duty that night driving an unmarked patrol car when he observed Jacoby's vehicle and began to follow it. Lawson radioed a physical description of the car to the dispatcher and to Deputy Steven Hearth, who was also on duty that night in the same area. Both advised Lawson that the car was not listed as stolen. Lawson then advised Hearth that the vehicle was trying to lose him; a "chase" ensued.
Lawson followed Jacoby at a high rate of speed, but he never activated his emergency lights or siren and never attempted to stop the vehicle. He radioed to the dispatcher that he was not "in pursuit" of the vehicle. When he got close enough to see the tag number, Lawson radioed the information to Hearth, who, after conducting a computer search, advised Lawson that the tag came back "clear." Inexplicably, Lawson continued the chase.
During the course of this chase, both cars far exceeded the posted speed limits *678 and failed to observe stop signs, traveling almost sixteen miles on several different roads and through the town of Lake Hamilton before Jacoby's car, while traveling east on Lake Hatchineha Road, left the roadway and struck a tree very near the edge of the roadway. White was ejected from the vehicle and killed instantly. The impact of the crash caused the car to break into two portions, the back half remaining at the initial point of impact and the front half coming to rest more than thirty feet away after hitting a second tree at the edge of the roadway. Both halves were on or near the shoulder of the road. Numerous items from inside the car were strewn around the wreckage. When Hearth arrived at the scene immediately after the crash, Lawson's vehicle was near the crash scene, facing west in the eastbound lane. Lawson explained that he had stopped following the Jacoby vehicle and was in the process of turning around when the crash occurred. However, Jacoby's expert testified that in his opinion Lawson had driven past the accident, stopped, turned around, and driven back to the point near the accident where Hearth found Lawson's car.
Polk County Sheriff's Deputy David Hooyman, a traffic investigator, arrived at the scene approximately two hours after the accident. During his investigation, he collected an empty cardboard beer carton and several other personal items that were found on the ground between the two halves of the car. He also took control of the two halves of the car, two empty cardboard twelve-pack beer cartons that were located within the trunk, and the vehicle's rear taillights.[1]
As a result of the accident and White's death, Jacoby was charged by information with vehicular homicide and DUI manslaughter. He moved to suppress all of the evidence gathered at the scene of the accident and during the ensuing investigation, arguing that the crash was the result of police misconduct and that the evidence collected was therefore inadmissible "fruit of the poisonous tree." The trial court rejected Jacoby's argument that all of the evidence should be suppressed, finding that while the items that were found in open view on the ground were admissible, certain other evidence, including the two halves of the car, the rear taillights from the car, and one empty twelve-pack beer carton found in the trunk of the car, must be suppressed. The trial court reasoned that Jacoby had an expectation of privacy and a possessory interest in the car itself and that, since no exception to the warrant requirement applied, the search and seizure of the car and its contents was improper.
Jacoby argued both at trial and on appeal that this case is controlled by the Florida Supreme Court's decision in Ippolito v. State, 80 So.2d 332 (Fla.1955), where the court suppressed certain evidence because the officers' behavior appeared to have caused the traffic infraction that allegedly supported the seizure. The trial court's failure to mention Ippolito here leads us to infer that the court rejected its application. For reasons we will explain, we agree with the trial court.
In Ippolito, a constable, his assistant, and his brother-in-law (who was not a law enforcement officer) were driving through the city streets in Tampa in a borrowed unofficial car  a green Cadillac. Id. at *679 332. All three were in plain clothes. They observed appellant John Ippolito enter a black Ford that was driven by appellant Gaspar Lamont. Id. at 332-33. At the time, Ippolito carried what appeared to be a shoe box.
The constable and his companions followed Lamont's car at a discreet distance until the constable observed Lamont run a stop sign. The constable then sped up and, within two blocks, caught up with Lamont's Ford. The constable yelled to Lamont; however, instead of stopping, Lamont sped up and a chase ensued. The two vehicles reached speeds of fifty-five to sixty miles per hour, at times going into private yards and once hitting a parked car. The chase lasted ten to fifteen minutes with the officers shooting their pistols three times at Lamont's car in an effort to stop it. The chase ended when Lamont's car hit a fence.
When Lamont's car stopped, Ippolito exited the car and began to flee on foot. The constable's assistant and brother-in-law chased Ippolito and tackled him. Although Ippolito was seen carrying brown envelopes while he was running, nothing was found on his person when he was later handcuffed. After taking Ippolito into custody, the assistant found several objects near the bushes where Ippolito had been tackled, which were later identified as illegal lottery paraphernalia. The constable also found a box of small, unsealed envelopes in the back seat of the Ford.
The trial court denied the motion to suppress filed by Ippolito and Lamont. The Florida Supreme Court reversed, concluding that the search was unreasonable because the major traffic infraction that would have justified the apprehension of Lamont and Ippolito was caused by the "deliberate acts of the officers themselves, which savor very strongly of entrapment if they do not actually amount to a species thereof." Id. at 334.
While Jacoby is correct that the facts in Ippolito and in the instant case are similar, the same considerations do not apply to both. First, the facts of this case are distinguishable from those in Ippolito. In Ippolito, the Florida Supreme Court concluded that it was necessary to use the sanction of suppression to deter "ill-advised acts of violence" caused by the officers themselves. Our reading of that opinion suggests that the court was referring to the pursuers' act of firing handguns three times during the high-speed chase through residential neighborhoods. The high-speed chase in Ippolito, coupled with the use of firearms during the daytime in a residential neighborhood, is significantly more serious than a high-speed chase during the very early morning hours in rural Polk County, as occurred here. As such, it was more deserving of a sanction.
Second, the purpose of imposing the sanction in Ippolito is not accomplished by imposing that sanction here. In Ippolito, the sanction was imposed to discourage certain types of police misconduct that occurred in the exercise of police authority. While the constable had the necessary probable cause to stop Lamont after he ran the stop sign, it was the exercise of that authority that led to the dangerous acts of violence that the court sought to sanction.
Here, however, Lawson never attempted to exercise any police authority. To the contrary, he was in an unmarked car, he never activated his emergency lights, and he never communicated to Jacoby in any way that he was a law enforcement officer. Moreover, there is no indication that Jacoby understood that the unmarked vehicle behind him was exercising police authority. Given the fact that any misconduct here *680 did not occur in the exercise of police authority, the act of sanctioning the State by suppressing evidence related to the accident would not have the same impact as it did in Ippolito because it would not provide instruction as to the proper exercise of police authority.
Third, the officer who committed the alleged misconduct in the instant case, Lawson, did not actually seize the items. By contrast, in Ippolito, the seizure was based on the misconduct of the seizing law enforcement officer. Florida law has changed since the Florida Supreme Court issued Ippolito in 1955. In 1982, the Florida Constitution was amended to provide that Florida courts would follow the United States Supreme Court's decisions in addressing search and seizure issues. See Perez v. State, 620 So.2d 1256, 1258 (Fla. 1993). Since that amendment was adopted, the United States Supreme Court has held that a seizure occurs either when law enforcement physically takes possession of the item or person or when the person acquiesces to the exercise of authority by a law enforcement officer. California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); see also Dempsey v. State, 717 So.2d 1071, 1073 (Fla. 1st DCA 1998) ("The Florida Supreme Court conformed Florida law to Hodari in Perez v. State, 620 So.2d 1256 (Fla.1993)."). In this case, however, Lawson, the officer accused of misconduct, never physically seized either Jacoby or the items in question. Even if we were to infer that Jacoby recognized the unmarked car as that of a law enforcement officer, his act of fleeing from Lawson negates any suggestion that he submitted to that authority and, as such, refutes the finding of a seizure. See State v. Wright, 662 So.2d 975 (Fla. 2d DCA 1995). Accordingly, since Lawson never seized any of the items at issue, Ippolito does not apply.
Rather, since Hooyman conducted the search and seizure after Lawson had left the scene, the admissibility of the items seized must be determined based on whether Hooyman's seizure was proper, not based on Lawson's behavior. As the trial court properly noted, when Hooyman arrived on the scene, he observed a number of items strewn about in open view in an area where Jacoby had no reasonable expectation of privacy. Given the proximity of the items to the two halves of the car, we conclude that Hooyman had probable cause to associate the property with criminal activity. See Jones v. State, 648 So.2d 669, 676 (Fla.1994). Accordingly, we affirm the trial court's denial of the motion to suppress all of the items found on the ground outside of the car and the evidence developed as part of the accident investigation.
However, Hooyman also seized the two halves of the car, the rear taillights, and two empty twelve-pack beer cartons from the vehicle's trunk as part of his investigation of the accident. Because Hooyman had a duty, as part of his investigation of an accident involving a death, to file a report detailing his findings regarding the circumstances that resulted in the death and the damage to the vehicle, see §§ 316.066(3)(a)(1), (2), .068, Fla. Stat. (2001), we conclude that his seizure of these items also was proper. To fully review the accident and to ensure the safety of the highway, it was essential for Hooyman to search and take possession of the car itself in order to conduct the full examination necessary to determine the cause of the wreck, especially in light of the seriousness of the damage. See South Dakota v. Opperman, 428 U.S. 364, 368-69, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) ("To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will *681 often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities.... The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.") (footnote omitted). Any expectation of privacy Jacoby may have had in the vehicle was diminished in light of the fact that an accident had occurred and the car was now essential evidence required for the complete investigation of that accident.
Furthermore, the two pieces of the car and the taillights, which themselves became evidence, were in open view on the ground and were properly seized without a warrant. See Jones, 648 So.2d at 676. As such, Investigator Hooyman properly secured the beer carton(s) from the trunk because he was justified in taking possession of the two halves of the car. See id. at 677.
Accordingly, we affirm that portion of the trial court order refusing to suppress the items found in plain view on the ground, but we reverse that portion of the order suppressing the two halves of the car, the taillights, and the beer carton(s).
Affirmed in part, reversed in part, and remanded.
STRINGER, J., Concurs.
CASANUEVA, J., Concurs with opinion.
CASANUEVA, Judge, Concurring.
I fully concur with the court's decision and write not only to underscore that Ippolito, 80 So.2d 332, is no longer good law but also to point out that suppression is not warranted based on the premises underlying the exclusionary rule.
As the majority opinion points out, Ippolito is no longer valid: its analytical framework is outmoded and built upon constitutional standards that have become antiquated since the United States Supreme Court's decisions in Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and California v. Hodari D., 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Article I, section 12, of the Florida Constitution mandates that this court apply those decisions.
The police officers in Ippolito testified that they were discreetly following a car that ran a stop sign; their subsequent attempt to apprehend the vehicle was constitutionally appropriate under Whren. Based on Hodari D, the officers seized Ippolito when they tackled him from the rear; this seizure led to a search and discovery of incriminating evidence. Moreover, Ippolito's flight from the car would be proper consideration for probable cause under Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). The Ippolito facts occurred more than fifty years ago. If the case were being reviewed today, I believe the outcome would be different.
Notwithstanding the current invalidity of Ippolito, and assuming that the evidence obtained in this matter was obtained illegally based on Ippolito, the analysis would not end there. Generally, the exclusionary rule would preclude the use of this evidence in the government's case. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The exclusionary rule, however, is a judicially created tool to deter improper police conduct and to protect the constitutional rights of the citizenry. United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). "The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the *682 Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
Were the question of the proper application of the exclusionary rule presented here, the answer might provide an alternative basis to support the reversal of this case. The exclusionary rule is not a personal constitutional right. Calandra, 414 U.S. at 348, 94 S.Ct. 613. Where the application of the exclusionary rule does not result in appreciable deterrence, its use may not be appropriate. United States v. Janis, 428 U.S. 433, 454, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). In United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that the exclusionary rule should not be applied to bar evidence obtained by an officer who acted in reasonable reliance upon a search warrant duly issued by a detached magistrate but later found to be invalid:
[W]here the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that ... the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty.
Id. at 919-20, 104 S.Ct. 3405 (citing Stone v. Powell, 428 U.S. 465, 539-40, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (White, J., dissenting)).
In this unique case, Deputy Hooyman arrived on scene two hours after the horrible crash to conduct an investigation. The record clearly shows that he behaved in an objectively reasonable manner, investigated in good faith, and engaged in no improper conduct. Suppression in this case would thus serve no deterrent effect and could cause a similarly situated officer in the future to curtail an investigation, resulting in substandard police work. There is no need, in this instance, to extract such a substantial societal cost by precluding the admission of the collected evidence.
NOTES
[1] The investigator testified that he located two beer cartons in the trunk of the car. The trial court's order suppressing the evidence that was found in the trunk only refers to one carton. For the purpose of this opinion, however, we conclude that the trial court's order of suppression applied to both beer cartons found in the trunk.