[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10670

_____

MARQUES A. JOHNSON,

Plaintiff-Appellee,

*versus*

CHRIS NOCCO,
in his official capacity as Sheriff, Pasco County, Florida,

Defendant,

JAMES DUNN,
in his individual capacity,

Defendant-Appellant.

———————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-01370-TPB-JSS

———————————————

Before WILSON, BRANCH, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This appeal presents two questions. The first is whether the Fourth Amendment precluded a law enforcement officer—who had stopped a vehicle for a traffic violation—from asking a passenger in the vehicle to identify himself *unless* the officer had reason to suspect that the passenger had committed, was in the process of committing, or was likely to commit a criminal offense. The second question is whether binding precedent[1] clearly established, at the time relevant here, that an officer could not ask a passenger to identify himself absent this reasonable suspicion. The District Court answered both questions in the affirmative and accordingly denied the officer's motion to dismiss the passenger's claim pursuant to the doctrine of qualified immunity.

———————————————

[1] *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) ("Our Court looks only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation.").

21-10670                Opinion of the Court                3

The officer appeals the District Court's decisions.[2]  Concluding that the District Court erred in denying the officer's motion to dismiss the passenger's claim, we reverse.

Our discussion proceeds as follows.  Part I sets out the passenger's claim under the Fourth Amendment (and relatedly under the Fourteenth Amendment) and the District Court's reasons for denying the officer's motion to dismiss the claim.  Part II reviews Supreme Court precedent concerning whether it is reasonable under the Fourth Amendment for an officer, during a traffic stop, to ask the vehicles occupants—the driver and passengers alike—to exit the vehicle.  Part III addresses how that precedent informs the answer to the question here—whether an officer may ask a passenger for identification absent a reasonable suspicion that the passenger has committed, is committing, or is likely to commit a criminal offense.  Part IV addresses whether the officer here lacked arguable probable cause to arrest the passenger under Florida Statute § 843.02 for refusing to comply with the officer's demand that he identify himself.  Part V concludes.

---

[2] We have jurisdiction to entertain this appeal under 28 U.S.C.§ 1291.  *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.").

## I.

### A.

The officer is James Dunn—a Pasco County, Florida Sheriff's Office deputy. Chris Nocco, the Pasco County Sheriff, is a codefendant with Dunn in the case below. The passenger is Marques A. Johnson. Johnson's initial complaint in this case consisted of twelve counts. Johnson's first amended complaint, the complaint at hand, contains ten counts. Count I of the amended complaint, which replicates *verbatim* Count I of the initial complaint, was brought against Dunn in his individual capacity and is the only count before us in this appeal.[3]

Count I seeks damages against Dunn under 42 U.S.C. § 1983[4] for violating Johnson's Fourth and Fourteenth Amendment rights

---

[3] The remaining nine counts of the amended complaint contain the following claims: Count II, against Nocco in his official capacity, alleging the constitutional claims asserted against Dunn in Count I; Count III, a common law claim against Nocco for negligence in training Dunn and others; Count IV, a common law claim against Nocco for negligence in supervising Dunn and others; Count V, a common law claim against Dunn for malicious prosecution; Count VI, a common law claim against Dunn for intentional infliction of emotional distress; Counts VII and VIII, common law claims against Dunn and Nocco respectively for battery; Counts IX and X, common law claims against Dunn and Nocco respectively for false imprisonment.

[4] Section 1983 (Civil action for deprivation of rights) states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

21-10670               Opinion of the Court                    5

on August 2, 2018, in Pasco County, Florida.  Count I alleges that Dunn, accompanied by Deputies Christopher Ramos and Mark Pini, stopped a motor vehicle towing a motorcycle on a trailer because the trailer's license tag was obscured.[5]  This vehicle was driven by Johnson's father (the "driver").  Dunn approached the front passenger side of the vehicle and obtained the driver's driver's license and vehicular registration.  Next, he asked Johnson, seated in the front passenger seat (another passenger was in the back seat), if he "had his 'ID on him.'"  Johnson replied that he was "merely a passenger in the vehicle and was not required to identify himself."  Dunn responded that "under Florida law he was required to identify himself and that if he did not identify himself, [Dunn] would 'pull him out and he would go to jail for resisting.'"  A Sheriff's Office "supervisor informed Deputy Dunn that he should arrest [Johnson]" for refusing to identify himself.  Dunn accordingly placed Johnson "under arrest for resisting without violence" in violation of Florida Statute § 843.02.[6]

---

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . for redress[.]

42 U.S.C. § 1983.

[5] *See* Fla. Stat. § 316.605(1) (Licensing of vehicles).

[6] Fla. Stat. § 843.02 (Resisting officer without violence to his or her person) states: "Whoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty . . . shall be guilty of a misdemeanor of the first degree."

As noted in the above text, Johnson was arrested on August 2, 2018. He moved the County Court for Pasco County to dismiss the § 843.02 charge,

6                    Opinion of the Court                    21-10670

Count I is styled "Fourth Amendment Violation – False Arrest" and asserts two causes of action: a claim that Deputy Dunn's demand that Johnson identify himself amounted to an unreasonable seizure in violation of the Fourth Amendment[7] and a claim that Dunn arrested Johnson without probable cause in violation of the Due Process Clause of the Fourteenth Amendment. The Fourth Amendment claim is based on *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), and its progeny. The due process claim is that Dunn lacked probable cause to arrest Johnson for violating § 843.02.

Dunn's request that Johnson identify himself was allegedly unreasonable because at the specific moment Dunn encountered Johnson he was, in effect, conducting a *Terry* stop[8] and could not demand that Johnson identify himself without "any specific basis for believing he [was] involved in criminal activity." Count I cites *Brown v. Texas*, 443 U.S. 47, 52–53, 99 S. Ct, 2637, 2641 (1979), a *Terry* progeny, in support of the claim. Moreover, Dunn could not "arrest [Johnson] for failure to identify himself if the request for identification [was] not related to the circumstances justifying the

---

and on November 9, 2018, the County Court heard the motion and granted it. The State moved the Court for reconsideration, and the Court denied the motion on November 21, 2018. Johnson brought this lawsuit on June 15, 2020.

[7] The Fourth Amendment is applicable to the states and local government through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 659, 81 S. Ct. 1684, 1694 (1961).

[8] *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

stop," according to the Supreme Court in *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 188, 124 S. Ct. 2451, 2459 (2004). The due process claim is that Johnson expressed his refusal to identify himself in "mere words." Dunn therefore lacked probable cause to arrest Johnson for resisting an officer without violence in violation of § 843.02.

Dunn moved to dismiss Count I of both the initial and amended complaints on the ground that the doctrine of qualified immunity immunized him from suit. Dunn's second motion took issue with the cases Count I relies on to support its Fourth Amendment claim, namely *Terry*, *Hiibel*, and *Brown*. Dunn argued that those cases did not support Count I's allegation that he could not ask Johnson to identify himself unless he reasonably suspected that Johnson had committed, was in the process of committing, or was likely to commit a criminal offense. He argued that, if anything, those cases supported his position—that Florida law permitted him to ask Johnson to identify himself. Dunn cited *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781 (2009), and *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S. Ct. 330 (1992), as recognizing, in the interest of officer safety, an officer's need to question the occupants of vehicles stopped for traffic violations.

## B.

The District Court ruled on Dunn's motion to dismiss Count I in two orders: one addressed the sufficiency of Count I of Johnson's initial complaint; the other addressed the sufficiency of

Count I of the amended complaint.[9]  For efficiency, we treat the two orders as one.

The District Court held that Dunn was entitled to assert the qualified immunity defense because, in conducting the traffic stop, he acted within the scope of his discretionary authority as a Sheriff's deputy.[10]  To overcome this defense, Johnson had to show (1) that Count I's allegations established that Dunn violated his Fourth Amendment right not to be asked to identify himself, and if so, (2) that right was clearly established at the time of the violation.  Exercising its discretion under *Pearson v. Callahan*, 555 U.S.

---

[9] The second order, which is very brief, essentially adopted the first order's analysis regarding Count I's sufficiency.

[10] A government official sued under a theory of direct liability, may "seek to have the complaint dismissed on qualified immunity grounds prior to discovery, based solely on the allegations in the pleadings." *See Holloman ex. rel. Holloman v. Harland*, 370 F.3d 1252, 1263 n.6 (11th Cir. 2004).

> To . . . be potentially eligible for . . . judgment due to qualified immunity, the official must have been engaged in a "discretionary function" when he performed the acts of which the plaintiff complains.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982) (holding that qualified immunity extends to "government officials performing discretionary functions").  It is the burden of the governmental official to make this showing.  *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (2003) ("Under qualified immunity analysis, *the public official* must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place." (emphasis added)).

*Id*. at 1263–64.

21-10670                 Opinion of the Court                        9

223, 236, 129 S. Ct. 808, 818 (2009), as to which showing it should address first, the Court addressed the two showings in order.

The District Court first found that Dunn had probable cause to initiate the traffic stop and a "valid basis to briefly detain both Plaintiff and his father who was driving the vehicle. *See, e.g.*, *Johnson*, 555 U.S. at 333 (temporary detention of driver and passengers during traffic stop remains reasonable for duration of the stop)." Dunn also had "a valid basis to require the driver to provide identification and vehicle registration." But he did not have "a valid basis to also require a passenger, such as Plaintiff, to provide identification, absent a reasonable suspicion that the passenger had committed, was committing, or was about to commit a criminal offense." The Court supported that statement by citing Florida Statute § 901.151(2)[11] and three U.S. Supreme Court decisions. In a parenthetical citation to this statute, the District Court said an

---

[11] Section 901.151(2), Florida's "Stop and Frisk Law," states in relevant part:

> Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, the officer may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding the person's presence abroad which led the officer to believe that the person had committed, was committing, or was about to commit a criminal offense.

Fla. Stat. § 901.151(2).

"officer may detain [a] person for purpose of ascertaining identity when [the] officer reasonably believes [the] person has committed, is committing, or is about to commit a crime."  The main Supreme Court decisions the District Court cited were *Hiibel*[12] and *Brown v. Texas*.[13]

Referring to § 901.151(2), the District Court acknowledged that the "Florida courts had not specifically held that law enforcement officers may require [a] passenger[] to provide identification during traffic stops absent a reasonable suspicion that the passenger had committed, was committing, or was about to commit a criminal offense."  The District Court concluded that "the ultimate source of authority on this issue is the Fourth Amendment as interpreted by the U.S. Supreme Court, not a specific provision of Florida law."[14]

---

[12] This parenthetical followed the *Hiibel* citation: "an officer may not arrest an individual for failing to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop."

[13] This parenthetical followed the *Brown* citation: "law enforcement cannot stop and demand identification from individual without a specific basis for believing he is involved in criminal activity."

The Court cited other decisions in reaching it decision to deny Dunn's motion to dismiss, but *Hiibel* and *Brown* were the Court's principal authorities.

[14] The District Court added: "In 1982, the Florida Constitution was amended to provide that Florida courts would follow the United States Supreme Court's decisions in addressing search and seizure issues.  *See Perez v. State*, 620 So. 2d 1256, 1258 (Fla. 1993)." ' *State v. Jacoby*, 907 So. 2d 676, 680 (Fla. 2d DCA 2005)."

The District Court concluded its analysis of Johnson's Fourth Amendment and False Arrest claims:

> Plaintiff had a legal right to refuse to provide his identification to Deputy Dunn. *As such, Deputy Dunn had neither actual probable cause nor arguable probable cause to arrest Plaintiff* [for violating § 843.02]. The Court further finds that based on the Fourth Amendment itself and the case law discussed, the law was clearly established at the time of the arrest. Deputy Dunn is not entitled to qualified immunity, and the motion to dismiss is denied as to this ground.

(emphasis added). An inference reasonably drawn from the emphasized language is that if Johnson did not have a legal right to refuse Dunn's command that he identify himself, Dunn had at least arguable probable cause to arrest him under § 843.02 for refusing to do so. Another inference reasonably drawn from the District Court's discussion about § 901.151(2) is that, if Johnson did not have the right to refuse Dunn's command, the statute's language—"had committed, was committing, or was about to commit a criminal offense"—would be inoperative here.

## II.

### A.

Deputy Dunn stopped the Johnson vehicle because he had probable cause to believe the driver had committed a traffic violation: its trailer's license tag was obscured. The stop constituted a Fourth Amendment seizure and detention of the vehicle's

occupants—the driver and two passengers—since they were not free to exit the vehicle or continue on their journey.[15] "[A] passenger is seized, just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.'" *Johnson*, 555 U.S. at 332, 129 S. Ct. at 787 (second alteration in original) (quoting *Brendlin v. California*, 551 U.S. 249, 263, 127 S. Ct. 2400, 2410 (2007)).

The traffic stop here was analogous to a *Terry* stop. "[I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Id*. at 327, 129 S. Ct. at 784. Here, it was lawful for Deputy Dunn to stop the vehicle and detain its occupants for the violation of a Florida Statute regulating the "licensing of vehicles." Fla. Stat. § 316.605(1).[16] Moreover, the occupants would expect the detention to continue, and remain reasonable, for the duration of the stop; they would be free to leave when Dunn had no further need to control the scene. *See Johnson*, 555 U.S. at 333, 129 S. Ct. at 788 ("Normally, the stop ends when the police have no further need to

---

[15] As noted, Dunn was aided by Deputies Ramos and Pini, who were with Dunn when he made the stop, and their supervisor.

[16] "[A]n officer making a [traffic] stop must have 'a particularized and objective basis for suspecting the person stopped of criminal activity.' Even minor traffic violations qualify as criminal activity." *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (en banc) (quoting *Navarette v. California*, 572 U.S. 393, 396, 134 S. Ct. 1683, 1687 (2014)) (other citations omitted), *cert. denied*, 143 S. Ct. 95, 214 L.Ed.2d 19 (2022).

control the scene, and inform the driver and passengers they are free to leave." (citing *Brendlin*, 551 U.S. at 258, 127 S. Ct. at 2407)).

Deputy Dunn's "mission" was "to address the traffic violation that warranted the stop" and to "attend to related safety concerns." *See Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015). While carrying out his mission, Dunn would have been mindful of the safety risk that officers face when conducting traffic stops. The Supreme Court recognized such danger in *Johnson*:

> [T]raffic stops are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S. Ct. 3469 (1983). "'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized . . . if the officers routinely exercise unquestioned command of the situation.'" *Maryland v. Wilson*, 519 U.S. 408, 414, 117 S. Ct. 882 (1997) (quoting *Michigan v. Summers*, 452 U.S. 692, 702–[]03, 101 S. Ct. 2587 (1981)).

555 U.S. at 330, 129 S. Ct. at 786 (second alteration in original).

Dunn exercised command of the seizure. He made the "ordinary inquiries incident to [the traffic] stop." *See Rodriguez*, 575 U.S. at 355, 135 S. Ct. at 1615 (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S. Ct. 834, 837 (2005)). Dunn asked the driver for his driver's license and vehicle registration, and he complied. Dunn could have asked any of the occupants about their travel plans and destinations. *See Campbell,* 26 F.4th at 885 (en banc)

(collecting cases) ("Generally speaking, questions about travel plans are ordinary inquiries incident to a traffic stop.").

Deputy Dunn's mission focused on the traffic violation that warranted the stop and related safety concerns. Even if Dunn's exchanges with the driver and Johnson were focused exclusively on the reason for the stop and safety, any additional exchange would not be unreasonable unless it measurably extended the duration of the stop. *Johnson*, 555 U.S. at 333, 129 S. Ct. at 788 (citation omitted) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.").[17]

### B.

In carrying out his mission, could Deputy Dunn ask the driver to step out of the vehicle?[18]

In *Mimms*, the Supreme Court considered whether requesting a driver to get out of his vehicle was reasonable under the Fourth Amendment. 434 U.S. at 108–13, 98 S. Ct. at 332–35. Given that "the central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the [officer's] invasion of

---

[17] Count I of the amended complaint does not allege that Dunn's conduct measurably extended the duration of the stop.

[18] Deputy Pini ordered the vehicle's occupants to exit the vehicle so he and his dog could conduct a narcotics sniff. The question I pose in the above text is whether, before the narcotics sniff, Dunn could have ordered the driver to exit the vehicle while Dunn engaged in the inquiries called for by the stop.

[the driver's] personal security[,]" *Terry,* 392 U.S. at 19, 88 S. Ct. at 1878–79, the Court in *Mimms* held that the "[r]easonableness [of the officer's request] depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" 434 U.S. at 109, 98 S. Ct. at 332 (quoting *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S. Ct. 2574, 2579 (1975)).

In distinguishing its inquiry from that in *Terry,* the *Mimms* Court explained:

> [T]here is no question about the propriety of the initial restrictions on [Mimms's] freedom of movement. [Mimms] was driving an automobile with expired license tags in violation of the Pennsylvania Motor Vehicle Code. . . . [The Court] need presently deal only with the narrow question of whether the order to get out of the car, issued after the driver was lawfully detained, was reasonable and thus permissible under the Fourth Amendment. This inquiry must therefore focus not on the intrusion resulting from the request to stop the vehicle . . . but on the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped.

*Id.* (footnote omitted).

In striking the balance described in *Brignoni-Ponce,* the *Mimms* Court "weigh[ed] the intrusion into [Mimms's] personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified [as part of the officer's mission], but by the order to get out of the car." *Id.* at 111, 98 S. Ct. at 333. The Court

concluded that the additional intrusion was *"de minimis"* and accordingly held that the officer's order was reasonable. *Id.* at 111, 98 S. Ct. *333*. "[I]t hardly rises to the level of a 'petty indignity.'" *Id.* (quoting *Terry*, 392 U.S. at 17, 88 S. Ct. at 1877).

The answer to the question posed above is that Deputy Dunn could have asked the driver to step out of his vehicle—not as part of Dunn's mission, but as an additional, incremental, and reasonable intrusion.

### C.

In carrying out his mission, could Deputy Dunn have asked a passenger—here, Johnson—to step out of the vehicle? Specifically, would the *Mimms* rationale and holding apply to a passenger?

In *Maryland v. Wilson*, 519 U.S. 408, 117 S. Ct. 882 (1997), the Supreme Court decided that it does. Ordering a passenger to exit the vehicle did not appear to be part of the officer's mission, so, as before, the *Wilson* Court struck the same balance described in *Brignoni-Ponce*. In doing so, it recalled how it weighed the public's interest and the driver's personal liberty in *Mimms*:

> On the public interest side of the balance, we noted that the State "freely concede[d]" that there had been nothing unusual or suspicious to justify ordering Mimms out of the car, but that it was the officer's "practice to order all drivers [stopped in traffic stops] out of their vehicles as a matter of course" as a "precautionary measure" to protect the officer's safety. We thought it "too plain for argument" that this

justification—officer safety—was "both legitimate and weighty."[19]

On the other side of the balance, we considered the intrusion into the driver's liberty occasioned by the officer's ordering him out of the car. Noting that the driver's car was already validly stopped for a traffic infraction, we deemed the additional intrusion of asking him to step outside his car *"de minimis."* Accordingly, we concluded that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures."[20]

*Id.* at 412, 117 S. Ct. at 885 (first and second alterations in original) (citations omitted).

The *Wilson* Court next moved to the issue then before it: whether *Mimms*'s reasonableness holding applied to passengers as

---

[19] After making that statement, the *Mimms* Court added this regarding the public interest: "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." 434 U.S. at 110, 98 S. Ct. at 333 (quotation marks omitted) (quoting *Terry*, 392 U.S. at 23, 88 S. Ct. at 1881). "And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Id.*

[20] The *Mimms* Court added that requiring the driver to exit his vehicle was "not a 'serious intrusion upon the sanctity of the person[.]'" 434 U.S. at 111, 98 S. Ct. at 333 (quoting *Terry*, 392 U.S. at 17, 88 S. Ct. at 1877). According to the *Mimms* Court, "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.*

well as drivers. The Court struck a balance between the public's and the passenger's respective interests:

> On the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger. Regrettably, traffic stops may be dangerous encounters. In 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops. Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 71, 33 (1994). In the case of passengers, the danger of the officer's standing in the path of oncoming traffic would not be present except in the case of a passenger in the left rear seat, but the fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer.
>
> On the personal liberty side of the balance, the case for the passengers is in one sense stronger than that for the driver. There is probable cause to believe that the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers. But as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car. Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger

compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

*Id.* at 413–14, 137 S. Ct. at 885–86 (footnotes omitted). On balance, the *Wilson* Court concluded that the public's interest in officer safety had greater weight than the passenger's personal liberty. As the Court summarized:

[D]anger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.

*Id.* at 414–15, 137 S. Ct. at 886.

So, in the case at hand, Deputy Dunn could ask Johnson to step out of the vehicle during the vehicular stop.

### III.

The District Court's answer to the first question this appeal presents was that the Fourth Amendment precluded Deputy Dunn

from requesting Johnson to identify himself because Dunn had no reason to suspect that Johnson had, was, or was likely to commit a criminal offense.  Stated another way, Johnson had a Fourth Amendment right to refuse Dunn's request.

Paraphrasing what the Supreme Court said in *Brendlin*, Johnson was seized just as the driver was from the moment the vehicle in which they were riding came to a halt on the side of the road. Under Florida law, all the vehicle's occupants would be asked to identify themselves.  The driver would be asked to produce his license and vehicle registration as part of Dunn's mission to investigate the traffic violation.  Assume for the sake of discussion that asking Johnson to identify himself was not part of Dunn's mission to investigate the violation; rather it was an additional intrusion into Johnson's liberty.

*Mimms* and *Wilson* instruct on how to determine whether the additional intrusion amounted to an unreasonable search under the Fourth Amendment.  We engage in *Brignoni-Ponce* balancing. In the setting here, we weigh the additional intrusion into the passenger's liberty against the public's interest in protecting officer safety.  In Florida, a passenger, like the vehicle's driver, expects to be asked for identification.  It is a precautionary measure to protect officer safety.  In *Mimms*, it was the officer's practice, not a state law, to order all drivers stopped for traffic violations to exit the vehicle as a "'precautionary measure' to protect the officer's safety."  *Wilson*, 519 U.S. at 412 (citation omitted).  That this practice weighed heavily on the public side of the *Brignoni-Ponce* scales was "too plain

for argument." *Id.* The practice's purpose, officer safety, was "both legitimate and weighty." *Id.*

The protection of officer safety was legitimate and weighty when Dunn asked Johnson to identify himself. Johnson was unaware of the state policy of requiring passengers in lawfully stopped vehicles to identify themselves. Should that unawareness counter the weight given the public's interest in officer safety? At best for Johnson, it's an open question.

The District Court's answer to the second question this appeal presents was that Supreme Court precedent clearly established that Deputy Dunn violated Johnson's Fourth Amendment right not to be subjected to an unreasonable seizure in requiring Johnson to identify himself. We disagree. Supreme Court precedent—in particular, the decisions the District Court relied on—did not clearly establish as a matter of Fourth Amendment law that an officer cannot ask a passenger to identify himself unless the officer has this reasonable suspicion or reason to believe that the passenger poses a risk to his safety. Therefore, Dunn is entitled to the dismissal of Johnson's Fourth Amendment claim under the doctrine of qualified immunity.

## IV.

The District Court concluded that Deputy Dunn lacked arguable probable cause to arrest Johnson for violating § 843.02 because Johnson had a Fourth Amendment right to refuse to identify himself when Dunn asked him to. The District Court erred. We doubt that the Florida Supreme Court would hold that a passenger

is free to resist an officer's request for identification in the setting this case presents. At the very least, it is arguable that the Court would uphold the request and find the officer had at least arguable cause to arrest the passenger for resisting an officer without violence in violation of § 843.02.

## V.

For the reasons we have expressed, the District Court's judgment denying Deputy Dunn's motion to dismiss pursuant to the doctrine of qualified immunity is

**REVERSED.**

21-10670                BRANCH, J., Concurring                1

BRANCH, Circuit Judge, Concurring:

To overcome a government official's invocation of the defense of qualified immunity, a plaintiff must show (1) that the official violated a constitutional right and (2) that the right was "clearly established" at the time of the official's purported misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Notably, we may address the two prongs in any order. *Id.* at 236. I take the second prong first.

The majority concludes that *Brown v. Texas*, 443 U.S. 47 (1979), and *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177 (2004), establish that Officer Dunn did not commit a constitutional violation when he required Johnson to provide identification during the traffic stop. The dissent, on the other hand, argues that binding Supreme Court precedent, including *Brown* and *Hiibel*, establishes that Officer Dunn did commit a constitutional violation when he required Johnson to provide identification. That the majority and the dissent vehemently debate the proper application of *Brown* and *Hiibel* to the particular facts of this case is an indication that the caselaw does not clearly establish that a constitutional violation occurred. *See District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (emphasizing that "existing precedent must place the lawfulness of the particular arrest 'beyond debate'" for a violation to be clearly established (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))).

The majority concludes that Johnson has failed to meet his burden on both prongs. But because Johnson has not satisfied the

2                    BRANCH, J., Concurring                  21-10670

"clearly established" prong of the qualified immunity analysis, I stop here and conclude that Officer Dunn is entitled to qualified immunity and that we need not address the first prong.  As such, I concur only in the judgment of the majority.

21-10670                WILSON, J., Dissenting                        1

WILSON, Circuit Judge, Dissenting:

Appellant James Dunn and other Pasco County police officers pulled over Appellee Marques Johnson's father for driving with an allegedly obscured license plate.  The traffic stop was routine, and the interactions between Johnson's father and the officers were amicable.  Officer Dunn demanded that Johnson—who was quietly sitting in the passenger seat of his father's car—identify himself. Johnson calmly stated that he was not the subject of the investigation and declined to provide his identification.  So, Officer Dunn arrested him.

The Supreme Court has consistently held that law enforcement officers cannot require, by threat of arrest, that an individual identify himself absent reasonable suspicion of wrongdoing, and to this day, the Court has not qualified this basic principle.  Because the majority attempts to manufacture a new exception to this important constitutional protection, I respectfully dissent.

I would affirm the well-reasoned decision of the district court denying Officer Dunn's motion to dismiss.

**I.**

On August 2, 2018, Johnson and another person were passengers in a motor vehicle driven by Johnson's father in Pasco County, Florida.  Officer Dunn stopped the vehicle, which was towing a motorcycle on a trailer, on the basis that the car's license plate was obscured from view.  Officer Dunn arrived with Officers

2                        WILSON, J., Dissenting                        21-10670

Ramos and Pini and a film crew from the A&E television show "Live PD."[1]

Officer Dunn approached the passenger side of the vehicle and requested the driver's information. He then asked Johnson if he had his "ID on him too." Johnson responded that he was not required to identify himself, being merely a passenger and not the subject of the investigation. Officer Dunn responded that Florida law required Johnson to identify himself and that he, Officer Dunn, would pull Johnson from the vehicle and arrest him for resisting an officer if he did not identify himself. Officer Ramos repeated that Johnson must identify himself. Officer Ramos then stated to Johnson's father, "Listen, you can tell us who he is. We can do it that way." Johnson's father, who had already provided his own identification, then identified Johnson as his son and provided Johnson's name to both Officers Dunn and Ramos. Officer Pini then approached, and Officer Dunn stated to him, "He didn't want to give me his ID and all that, but his dad gave him up."

After making a brief trip to the police car to enter information into his computer, Officer Dunn returned and asked Officer Pini to have his police dog conduct a drug sniff of the car. Officers Dunn and Pini agreed they would ask Johnson to exit the car and would forcefully pull him out if he did not exit voluntarily. Officer Pini then told Johnson and the other vehicle occupants that his dog would be conducting a narcotics sniff of the vehicle and ordered

---

[1] The traffic stop was captured by the film crew, a video recording of which remains accessible at https://youtu.be/zXEXu640E1k.

21-10670                 WILSON, J., Dissenting                 3

Johnson to exit. As Johnson was exiting the vehicle, Officer Dunn stated to Officer Pini that "I am going to take him in no matter what because he's resisting me." Officer Dunn then placed Johnson in handcuffs. After placing him in handcuffs, Officer Dunn grabbed Johnson's pinky finger and twisted it away from the rest of his hand to force him to release his wallet. After Johnson asked why he was being arrested, Officer Dunn responded that it was because Johnson did not give his name when it was demanded, and therefore, he was resisting. While Johnson was seated in Officer Dunn's police vehicle, Officer Dunn entered Johnson's information into the computer.

At this time, Officer Ramos was speaking to Johnson's father and the other passenger, while Officer Pini searched the vehicle. Johnson's father again provided Johnson's information to Officer Ramos, even confirming the spelling of Johnson's first name and providing Johnson's date of birth.

Officer Ramos then went to Officer Dunn to provide him with this information, but Officer Dunn responded, "Oh, I got it. I got his ID out of his wallet." Officer Dunn then explained to Johnson's father that he was taking Johnson to jail because Florida law mandated that "all occupants of the vehicle are required to . . . identify themselves, they don't have to physically produce an identification, but they got to at least ID themselves and we got to be able to ID who is in the car . . . [s]o with him doing that, its obstruction . . . ." He then stated, ". . . if anyone prevents me from doing my job, I am going to take them to jail. I understand he is trying

to exercise his rights there and everything, but we also have rights to do our job." Officer Pini did not find any drugs in the car.

Johnson was taken to the Pasco County Jail and charged with a violation of Florida Statute § 843.02, Resisting Officer Without Violence to His or Her Person. The charges against Johnson were dismissed.

Johnson sued Officer Dunn in his individual capacity, and Sheriff Chris Nocco in his official capacity, in federal district court for alleged constitutional and state law violations. The defendant officers moved to dismiss. In response to Johnson's constitutional claim—False Arrest in violation of the Fourth Amendment—the officers argued they were entitled to qualified immunity. The district court granted the motion in part and denied it in part. Relevant here, the district court rejected Officer Dunn's qualified immunity defense because Johnson had a legal right to refuse to provide his identification; therefore, Officer Dunn had neither actual nor arguable probable cause to arrest Johnson based on law that was clearly established at the time of the arrest. Officer Dunn appealed the denial of qualified immunity.

## II.

Officer Dunn challenges the district court's denial of qualified immunity for Johnson's § 1983 false arrest claim. Qualified immunity protects municipal officers from liability in § 1983 actions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Establishing

a qualified immunity claim engages the parties in a burden-shifting test. *See Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009). Under this test, the officer must first demonstrate that he acted "within his discretionary authority." *Id.* Once the officer has established this, the plaintiff must "show that qualified immunity should not apply." *Id.* At this point, we utilize a two-prong framework, asking 1) whether the officer's conduct "amounted to a constitutional violation," and 2) whether the right was "clearly established" at the time of the violation. *T.R. ex rel. Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 882–83 (11th Cir. 2022).

Officer Dunn arrested Johnson for violating Florida Statute § 843.02, which states that "[w]hoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree." There is no dispute that Officer Dunn was acting within his discretionary authority at the time of the arrest. So, for Johnson's claim to overcome Officer Dunn's defense of qualified immunity, Johnson must first show that Officer Dunn lacked probable cause to make the arrest—a constitutional violation—by showing either 1) that Officer Dunn was not engaged in "the lawful execution of any legal duty" when he required Johnson to reveal his identity, or 2) that he, Johnson, was not "resist[ing], obstruct[ing], or oppos[ing] any officer" under our interpretation of § 843.02. Then, Johnson must demonstrate that at least one of these foundations for a constitutional violation was clearly established at the time of the incident, such that Officer Dunn would not have even arguable probable cause to make the

6                         WILSON, J., Dissenting                      21-10670

arrest.  If Johnson makes either of these showings, Officer Dunn is not entitled to qualified immunity.

I would conclude that Officer Dunn lacked probable cause to arrest Johnson for two reasons.  First, because the Supreme Court has time and again held that law enforcement officers cannot require identification from citizens without reasonable suspicion of wrongdoing, and they certainly cannot arrest those citizens unsuspected of wrongdoing for declining to disclose their identities, Officer Dunn was not engaged "in the lawful execution of any legal duty" when he arrested Johnson.  The majority seems to recognize this principle but concludes that officers' understandable anxiety about not knowing the names of everyone in a vehicle at a traffic stop justifies a new traffic-stop-safety exception to this constitutional safeguard.  Because the Supreme Court has never carved out this deep of an exception, neither should we.  Second, Johnson did not "resist, obstruct, or oppose" Officer Dunn under this court's interpretation of Florida Statute § 843.02.  For these reasons, I would conclude that Johnson's arrest lacked probable cause and thus violated the Fourth Amendment's protections.  Further, because the Supreme Court precedents that establish these principles date back decades, I would hold that, at the time of Johnson's arrest, it was clearly established that Officer Dunn's conduct amounted to a constitutional violation.  I will address each of these points in turn.

Before I do, though, I will pause to make a couple brief notes.  There is no question that our nation's law enforcement

21-10670                WILSON, J., Dissenting                    7

officers must frequently perform difficult, dangerous, and often thankless tasks in the service of their communities. The risks borne by officers is often underappreciated, and I doubt many officers who stumble over the constitutional line while confronting the undeniable stresses of their sworn duties do so with any malicious intent. Yet even mistakes that carry well-meaning officers over the line are nonetheless constitutional violations. I hold nothing but the utmost respect for my colleagues in the majority for their well-articulated positions on this matter. But, because I believe a citizen's clearly established constitutional right was violated in this case, I believe the district judge got it right, and I must therefore dissent. Now, I will explain why.

### III.

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Our analysis of whether a citizen's Fourth Amendment rights were violated under a particular set of facts considers "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19 (1968).

Whether an arrest meets the "reasonableness" requirement of the Fourth Amendment depends on "the presence or absence of probable cause for the arrest." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). "[P]robable cause exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or

8                      WILSON, J., Dissenting                      21-10670

substantial chance of criminal activity.'" *Washington v. Howard*, 25 F.4th 891, 898–99 (11th Cir. 2022) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)).

Determining whether Officer Dunn's conduct amounted to a constitutional violation requires this court to decide whether an officer may compel a passenger at a lawful, routine traffic stop to identify himself—absent reasonable suspicion that the passenger was engaged in any criminality, and absent any extraordinary safety concerns. In addition, this court must consider whether the mere refusal to provide one's name to police officers while they investigate the conduct of another amounts to "resistance" or "obstruction" under Florida Statute § 843.02. Guided by precedent, I would answer both inquiries in the negative. Consequently, I would hold that Officer Dunn's arrest of Johnson lacked probable cause and constituted an unreasonable search and seizure in violation of the Fourth Amendment's protections.

### A.   Lawful Execution of Any Legal Duty

Officer Dunn arrested Johnson for declining to provide his name as a passenger at a routine traffic stop. For Officer Dunn to have probable cause to make this arrest under Florida Statute § 843.02, he must have been engaged in the "lawful execution of any legal duty" when he required Johnson to disclose his identity. The question, then, is whether it was lawful for Officer Dunn, absent any reasonable suspicion that Johnson had engaged in wrongdoing, to require Johnson to identify himself.

For Officer Dunn's requirement to be lawful, it must be consistent with the Fourth Amendment's command that government intrusions into privacy be reasonable under the circumstances. *See Grady v. North Carolina*, 575 U.S. 306, 310 (2015) (per curiam) ("The Fourth Amendment prohibits only *unreasonable* searches."). An intrusion is generally reasonable if the government interest in conducting the search outweighs the private citizen's interest in remaining free from arbitrary government interference. *See Terry*, 392 U.S. at 20–21; *Illinois v. Lidster*, 540 U.S. 419, 427 (2004) ("[I]n judging reasonableness, we look to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979))).

For the government interest side of the scale to carry any weight, however, we must find both that the officer's "action was justified at its inception, and [that] it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21.

I restate the facts of the stop as relevant to this point. Officer Dunn pulled over the vehicle carrying Johnson because the car's license plate was obscured by an attached trailer. Johnson's father operated the vehicle, while Johnson rode as a passenger in the front seat. Consistent with the scope of the investigation into the license

plate, Officer Dunn requested identifying information from Johnson's father, who quickly complied. Then, despite *not suspecting Johnson of any connection to the license plate or any other criminal activity*, Officer Dunn required Johnson to disclose his identity as well. Johnson, citing his constitutional rights and the fact that he was only a passenger in the vehicle, declined to do so. Officer Ramos then told Johnson's father that they could obtain Johnson's information from him instead, and Johnson's father subsequently identified his son. So, within one minute of Johnson's initial refusal to reveal his identity, the officers acquired the information they sought. Nonetheless, Officer Dunn arrested Johnson for resisting an officer without violence.

In my view, this arrest ran afoul of the Fourth Amendment's protections. As caselaw from the Supreme Court and this circuit makes clear, a police officer may not arrest individuals for declining to provide their names absent any reasonable suspicion of wrongdoing.

In *Brown v. Texas*, police officers detained and arrested a pedestrian for violating a Texas law requiring a lawfully detained individual to provide his name and address to an officer who requests the information. 443 U.S. at 49. But there, the Supreme Court held that the arrest violated the Fourth Amendment "because the officers lacked any reasonable suspicion to believe appellant was engaged or had engaged in criminal conduct." *Id.* at 52–53. Rejecting the State's justification that the statute advanced the social objective of "prevention of crime," the Court stated that "even assuming

that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it." *Id.* at 52. As the Court noted, "[in] the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." *Id.* Although *Brown* involved a plaintiff who was detained outside of a vehicle, the Court conducted the same *Terry* Fourth Amendment analysis relevant here. *See id.* at 50–51. This is because the Fourth Amendment "applies to all seizures of the person . . . [and] [w]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 50 (internal citations and quotations omitted). Thus, as far back as 1979, the Supreme Court made clear that officers may not detain individuals and require them to identify themselves absent reasonable suspicion of criminal conduct. *See id.* at 52.

Twenty-five years later, in *Hiibel v. Sixth Judicial District Court of Nevada*, investigating officers received a report that a man had assaulted a woman in a red and silver GMC truck at a specific location. 542 U.S. 177, 180 (2004). Police officers drove to that location, spotted the truck, approached the suspect, and asked for the suspect's identification in order to further their investigation. *Id.* at 180–81. The suspect refused to identify himself after being asked eleven times, so the officers arrested him for violating Nevada's "stop and identify" statute. *Id.* This time, the Court dismissed the petitioner's Fourth Amendment claims because "there [was] no

12                    WILSON, J., Dissenting                    21-10670

question that the initial stop was based on reasonable suspicion, satisfying the Fourth Amendment requirements noted in *Brown*." *Id*. at 184. The Court determined that *suspects* may be required to identify themselves at *Terry* stops. *See id*. at 186 ("Our decisions make clear that questions concerning a *suspect's* identity are a routine and accepted part of many *Terry* stops." (emphasis added)); *see also id*. at 187–88 ("The principles of *Terry* permit a State to require a *suspect* to disclose his name in the course of a *Terry* stop. . . . The request for [the suspect's] identity has an immediate relation to the purpose, rationale, and practical demands of a *Terry* stop." (emphasis added)). But the Court also reaffirmed and reemphasized the principle that "an officer may not arrest a *suspect* for failure to identify himself if the request for identification is *not reasonably related* to the circumstances justifying the stop." *Id*. at 188 (emphases added).

Here, police officers stopped a vehicle driven by Johnson's father due to an allegedly obscured license plate. Unlike the petitioner in *Hiibel*, Johnson—a passenger in the vehicle—was not the "suspect" of any alleged crime, and his identity bore no relation to the allegedly obscured license plate that justified stopping his father's car in the first place. Much more like the petitioner in *Brown*, the officers possessed no reasonable suspicion to believe Johnson had engaged in any criminal conduct when they required him to reveal his identity. *See* 443 U.S. at 52–53. Without this requisite suspicion, however, the officers could not, consistent with the

21-10670                WILSON, J., Dissenting                13

Fourth Amendment, require identification from Johnson.  *See id.*[2]
Although requiring the name of a passenger may seem like an insignificant procedural matter, I think it obvious that the government has no interest in taking any step, however slight, beyond the bounds of the Constitution.

By my reading of the caselaw, it was not lawful for Officer Dunn *to require* the disclosure of Johnson's identity absent reasonable suspicion of wrongdoing.  Consequently, Officer Dunn was not engaged "in the lawful execution of [a] legal duty" under Florida Statute § 843.02 and lacked probable cause to arrest Johnson.  The arrest, therefore, violated Johnson's constitutional rights.

### B.  *Officer Safety*

Notwithstanding *Terry*'s holding that a seizure must be "justified at its inception" and any subsequent search must be

---

[2] I note that Officer Dunn's conduct violated the Fourth Amendment because he *required* Johnson to disclose his identity.  Contrary to the majority's contention, I recognize that it is abundantly clear that Officer Dunn was free to *request* Johnson's name.  In *Florida v. Bostick*, the Supreme Court noted that "even when officers have no basis for suspecting a particular individual, they may generally *ask questions* of that individual." 501 U.S. 429, 434–35 (1991) (emphasis added).  Police officers cross the constitutional line, however, when they "convey a message that compliance with their requests is required." *Id*. at 435. Indeed, the Court emphasized that absent reasonable suspicion of wrongdoing, it had "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Id*. at 437 (collecting cases).  While *Bostick* did not involve a traditional traffic stop, it did involve questioning a passenger on a parked commercial bus, a situation that, largely, presents the same risks to officers at issue here.  *See id*. at 431–32.

"reasonably related in scope to the circumstances" that justified the initial interference, 392 U.S. at 20, Officer Dunn asks this court to hold that a deputy can constitutionally command *passengers* at traffic stops to reveal their identities—even absent reasonable suspicion of wrongdoing—and arrest those who fail to comply. While this proposition seems to fly in the face of *Brown* and *Hiibel*, Officer Dunn argues that general traffic-stop safety concerns make such an intrusion into the liberties of vehicle passengers reasonable, even if those passengers have done nothing specific to warrant such an intrusion. In making this argument, Officer Dunn does not articulate any specific safety concerns the passengers presented during this routine traffic stop. Rather, Officer Dunn argues that a generalized concern that officers may not know "who a passenger might be and whether that passenger has a warrant out for his arrest or might otherwise present a safety risk" justifies a broad rule that officers may require identification from passengers at every traffic stop. Initial Brief of Defendant/Appellant James Dunn at 8, Johnson v. Dunn, No. 21-10670 (11th Cir. filed July 19, 2021). After reviewing the Supreme Court's precedents on this issue, I disagree.

I start with the basic rule that "[a] seizure for a traffic violation justifies a police investigation *of that violation*." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (emphasis added). During a traffic stop, police officers' "mission" is "to address the traffic violation that warranted the stop and attend to *related* safety concerns." *Id.* (emphasis added) (citation omitted). It must be remembered, though, that "the government's officer safety interest stems from the mission of the stop itself." *Id.* at 356. So, while traffic stops

21-10670                WILSON, J., Dissenting                15

indeed pose unique risks to police officers, and those risks in turn may justify "negligibly burdensome precautions," those precautions may not "detour[]" from the officers' mission. *Id.*

To be sure, the Supreme Court has identified specific safety risks unique to traffic stops and related to officers' missions that warrant additional, targeted intrusions into vehicle occupants' liberties regardless of reasonable suspicion. Yet—as I discuss below—the specific dangers cited by the Court are not lessened to any significant degree by knowing the names of passengers entirely unsuspected of wrongdoing.

The majority highlights those same unique dangers to argue in favor of creating a broad rule that would allow police officers to extract the names of passengers at any traffic stop, regardless of reasonable suspicion. The majority cites principally to two cases: *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (per curiam) and *Maryland v. Wilson*, 519 U.S. 408 (1997). Yet, by my reading, those cases do not support the proposition that requiring the names of passengers unsuspected of wrongdoing during a routine traffic stop is part of the officers' lawful mission or, at most, a *de minimis* additional intrusion. Rather, in my opinion, those cases stand for the principle that specific risks unique to traffic stops make it reasonable for officers to exercise temporary physical control over drivers and passengers.

In *Mimms*, the Court held that officers may require the *driver* of a vehicle reasonably stopped for a traffic violation to step out of the automobile. 434 U.S. at 111. To reach this conclusion, the

Court balanced the public interest proffered by the State—police officer safety—with an individual's right to be free from arbitrary government interference. *Id.* at 109. The Court found "too plain for argument" the State's safety justification, citing 1) the danger that officers may face dealing with an individual whose movements may be obscured while inside a vehicle, and 2) the hazard created by passing traffic while an officer stands on the driver's side of an automobile. *Id.* at 110–11. "Against this important interest," the Court considered a request to get out of a vehicle to be a *de minimis* intrusion because "[t]he driver is being asked to expose to view very little more of his person than is already exposed" and "[t]he police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." *Id.* at 111.

In *Wilson*, the Supreme Court extended its reasoning in *Mimms* to hold that law enforcement may also require *passengers* to get out of a vehicle during a traffic stop. 519 U.S. at 415. This time, the Court weighed the public interest in officer safety against the personal liberties of passengers. *See id.* at 413–14. The Court found that while the danger posed by oncoming traffic is reduced on the passenger-side of the vehicle, "the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver," and therefore, it is reasonable to require passengers *to step outside of a vehicle* where they "will be *denied access to any possible weapon* that might be concealed in the interior of the passenger compartment." *Id.* at 414 (emphases added).

Indeed, it is this risk of "sudden violence or frantic efforts to conceal or destroy evidence" that counsels officers to "routinely exercise unquestioned command of the situation." *Id.* (quoting *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981)). This situational command is achieved by briefly controlling the physical movements of vehicle occupants. Considering the personal liberty side of the scale again, the Court noted that although there is no probable cause to believe the passengers committed a vehicular offense, like in *Mimms*, the only practical difference for passengers "is that they will be outside of, rather than inside of, the stopped car." *Id.* On balance, then, the Court found that requiring passengers to step out of an automobile during a traffic stop is reasonable under the circumstances. *See id.* at 415.

Both *Mimms* and *Wilson* dealt with a specific risk inherent in traffic stops: the possibility of vehicle occupants accessing the means with which to do violence. The solution—permitting officers to require vehicle occupants to step outside of the automobile—directly targeted that specific risk by physically moving occupants away from any concealed weapons. Here, however, there is a misalignment between the specific risk identified in *Mimms* and *Wilson* and Officer Dunn's actions. Indeed, it is unclear how knowing the name of a passenger who is not suspected of any wrongdoing would significantly help to prevent that passenger from reaching concealed weapons and committing acts of violence. *See Mimms*, 434 U.S. at 110 (citing a report on officer shootings to support the Court's recognition of the "inordinate risk confronting an

18                    WILSON, J., Dissenting                    21-10670

officer as he approaches a person seated in an automobile").[3]  To the degree that knowing the names of each vehicle occupant does address the specific risk identified in *Mimms* and *Wilson*, it does so in a way far more indirect—far more like a proscribed "detour"—than the method endorsed in *Mimms* and *Wilson*.[4]

---

[3] My position would not leave police officers without any ability to take precautionary measures.  If officers suspect that vehicle occupants are concealing weapons or might destroy evidence—or even if they do not—the Supreme Court has prescribed a solution: they may order everyone out of the vehicle. *See Wilson*, 519 U.S. at 415.  As described in more detail below, officers have even more prophylactic tools at their disposal if they develop a reasonable suspicion that a safety risk in fact exists or if a hazardous situation arises.

[4] In *United States v. Landeros*, the Ninth Circuit rejected the idea that extending the length of a traffic stop to determine a passenger's name would enhance officer safety, noting that "knowing [the passenger's] name would not have made the officers any safer.  Extending the stop, and thereby prolonging the officers' exposure to [the passenger], was, if anything, inversely related to officer safety."  913 F.3d 862, 868 (9th Cir. 2019) (quotation marks omitted).  While I do not go so far here, I note that other circuits—though, only the Ninth explicitly contemplated officer safety concerns—have held that, absent reasonable suspicion of wrongdoing, officers may not rely on a passenger's mere failure to identify himself *at a traffic stop* as a justification for an arrest or a prolonged detention.  *See id.* at 870 (finding that officers may not extend a traffic stop to demand a passenger's identity absent reasonable suspicion of criminality); *Corona v. Aguilar*, 959 F.3d 1278, 1283–85 (10th Cir. 2020) (holding that officers could not arrest a passenger for concealing his identity absent "a particularized and objective basis for suspecting Plaintiff had committed any offense or was engaging in criminal activity"); *Johnson v. Thibodaux City*, 887 F.3d 726, 734 (5th Cir. 2018) (concluding that officers could not continue the detention of a passenger unsuspected of wrongdoing "solely to obtain identification").

21-10670                WILSON, J., Dissenting                19

And I must still balance the government interest in taking this detour against considerations of individual liberties. Again, the liberty interest at stake here is quite different from the one addressed in *Mimms* and *Wilson*. Unlike being asked to expose a little more of one's body during a traffic stop, having to disclose one's identity is a much greater (and permanent) additional intrusion into privacy. The question in a case like Johnson's is not simply whether a passenger would spend a brief traffic stop inside or outside of a car, but whether a passenger would be forced to reveal to law enforcement his identity (and everything attendant to it). While the latter intrusion may only seem slight—or *de minimis*— its constitutional significance is highlighted by those cases that require officers to have reasonable suspicion of criminality before being able to require that information. *See Brown*, 443 U.S. at 52; *Hiibel*, 542 U.S. at 187–88; *Bostick*, 501 U.S. at 437. Given the minimal degree to which extracting the names of passengers unsuspected of wrongdoing addresses the risks identified in *Mimms* and *Wilson*, I would find that "the balance between the public interest and [the individual's] right to personal security and privacy tilts in favor of freedom from police interference." *Brown*, 443 U.S. at 52.

Because the rule proposed by Officer Dunn bears little relation to those dangers specifically identified in *Mimms* and *Wilson*, I am left only to consider the separate risk that Officer Dunn identified: not knowing every individual in the vehicle, their criminal record, or their proclivity for violence. This risk—not knowing everyone in a group while investigating the conduct of an individual—is not unique to a traffic-stop setting. Rather, it arises any time police

officers deal with a single person in a gathering, and the Supreme Court has yet to identify any situation in which law enforcement may require individuals unsuspected of wrongdoing to disclose their identities. Thus far, the Court has only crafted a narrow, per se rule permitting additional intrusions *without reasonable suspicion* at traffic stops in order to address dangers that are inherent and unique to traffic stops. *See Wilson*, 519 U.S. at 414–15.

When police officers conducting traffic stops are faced with legitimate safety concerns and want to do anything more than have vehicle occupants step outside of the automobile, the Supreme Court generally requires something more to be shown in order to justify the additional intrusions into privacy. This "something more" may either be reasonable suspicion that a safety risk in fact exists or the development of a hazardous situation. In *Knowles v. Iowa*, the Court identified a number of precautionary steps that officers may take to protect themselves during traffic stops. 525 U.S. 113, 117–18 (1998). These steps include requiring drivers and passengers to step out of a vehicle, *id.* at 118 (citing *Mimms*, 434 U.S. at 111 and *Wilson*, 519 U.S. at 414, respectively); patting down drivers and passengers for concealed weapons "upon reasonable suspicion that they may be armed and dangerous," *id.* (citing *Terry*, 392 U.S. at 29–30); and searching the passenger compartment of a vehicle for weapons "upon reasonable suspicion that an occupant is dangerous and may gain immediate control of a weapon," *id.* (citing *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). *Arizona v. Gant* also grants officers the ability to search a vehicle's passenger compartment "when the arrestee is unsecured and within reaching distance

21-10670                    Wilson, J., Dissenting                    21

of the passenger compartment at the time of the search" or "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" 556 U.S. 332, 343 (2009) (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)).[5]

Importantly, these additional intrusions are specifically designed to physically separate vehicle occupants from weapons. And just as important for this case, out of this procedural toolkit, only the minimally invasive step of having vehicle occupants briefly step outside can be justified by general traffic stop safety concerns. That is, *Knowles* demonstrates that officers may, as a starting point to protect their safety, require occupants to step out of a vehicle at traffic stops. But if they wany to intrude any further, they need either reasonable suspicion or some extraordinary safety concern. *See Knowles*, 525 U.S. at 117–18 (noting that while officers may order the driver and passengers out of the car, they may only conduct pat-downs of individuals or search compartments "upon reasonable suspicion"). Here, neither were present.

In my view, the precedents established by the Supreme Court require this panel to reject Officer Dunn's invitation to create a new, broad rule granting police officers authority to extract the

---

[5] *Knowles* originally cited *New York v. Belton*, 453 U.S. 454, 460 (1981) for the proposition that officers may conduct a full search of a vehicle and "containers therein" incident to a custodial arrest. 525 U.S. at 118. *Belton*, however, was effectively abrogated by *Gant*. *See* 556 U.S. at 343–44; *see also Davis v. United States*, 564 U.S. 229, 234–35 (2011) (recognizing the abrogation).

22                    WILSON, J., Dissenting                    21-10670

names of any vehicle passenger at any traffic stop, regardless of whether reasonable suspicion is present.

This is not to say, however, that officer safety concerns can never justify police requiring identification from passengers at traffic stops in the absence of reasonable suspicion. The record in this case does not require me to consider that question today. With regard to officer safety, all I would hold is that the safety concern alleged by Officer Dunn—the general risk arising from not knowing the names of every vehicle occupant at a routine traffic stop—does not justify the additional intrusion of compelling a passenger unsuspected of wrongdoing to disclose his identity to the government.

In my opinion, Officer Dunn's requirement that Johnson identify himself was not made lawful through reasonable suspicion or officer-safety concerns, and therefore, Johnson committed no crime by refusing to comply. As a result, there was no probable cause to believe that Johnson had violated Florida Statute § 843.02.

## C. Resist, Obstruct, or Oppose

As a refresher, the statute under which Johnson was arrested makes it a crime to "resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer." Fla. Stat. § 843.02. Above, I addressed the question of whether, in my view, Officer Dunn was engaged in the "lawful execution of any legal duty," and answered in the negative. Here, I address the additional question of whether a person's non-violent refusal to comply with an (unlawful)

21-10670            WILSON, J., Dissenting            23

demand to disclose his identity can constitute resistance or obstruction of a nearby investigation unrelated to that demand. I would conclude that it cannot. Reviewing our caselaw, it is clear to me that "mere words" do not constitute obstruction under Florida Statute § 843.02. Accordingly, for this reason too, Johnson's arrest lacked probable cause and thus violated the protections guaranteed by our Constitution.

For years, we have recognized that verbal interruptions and inquiries as to an officer's purpose cannot, on their own, justify probable cause for an arrest under Florida Statute § 843.02. *See Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006). We have also previously held that "'mere words' would not suffice to provide probable cause for resisting without violence." *Alston v. Swarbrick*, 954 F.3d 1312, 1319 (11th Cir. 2020). In doing so, we found that a defendant officer lacked probable cause for making an arrest under § 843.02 where the arrestee "merely declined to cooperate or provide useful information" concerning an officer's investigation into someone else. *Id.*

Officer Dunn required Johnson's identification while investigating an obscured license plate on a vehicle driven by Johnson's father. In response, Johnson simply stated—correctly, in my view—that he was only a passenger in the vehicle and was therefore not required to provide his name. Although Officer Ramos requested and quickly received Johnson's identifying information from Johnson's father, and although Officer Dunn later confirmed with his fellow officers that he had verified this information as true

and accurate, Officer Dunn nonetheless arrested Johnson for obstructing an officer without violence. But absent some hinderance beyond mere words, Officer Dunn lacked probable cause to make this arrest under our interpretation of § 843.02.[6] Because Officer Dunn lacked probable cause, his arrest of Johnson violated Johnson's constitutional rights.

## IV.

Having concluded that Officer Dunn violated Johnson's constitutional rights by arresting him under Florida Statute § 843.02 without probable cause, I now consider whether Johnson's rights in this situation were clearly established. *See Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted).

> A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle

---

[6] Beyond declining to provide his name, nothing in the record suggests that Johnson did anything to obstruct the officers' investigation into the license plate and their later fruitless drug search. *See Alston*, 954 F.3d at 1319 (noting that that probable cause for an arrest under § 843.02 does not exist when someone "merely decline[s] to cooperate or provide useful information" and does not "physically obstruct [an officer's] path or otherwise prevent him from conducting his investigation as to [another person]").

within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*D.H. ex rel. Dawson v. Clayton Cnty. Sch. Dist.*, 830 F.3d 1306, 1318 (11th Cir. 2016).

Law enforcement officers can marshal a successful qualified immunity defense if they can show that they had "arguable probable cause" to effectuate an arrest. *Hardigree v. Lofton*, 992 F.3d 1216, 1225 (11th Cir. 2021). "Arguable probable cause exists if 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed.'" *Id.* (quoting *Swint v. City of Wadley*, 51 F.3d 988, 996 (11th Cir. 1995)). This determination "depends on the elements of the alleged crime and the operative facts." *Id.* at 1230. Here, if Johnson's rights were not "clearly established," then Officer Dunn had arguable probable cause to make the arrest.

In my opinion, it was clearly established that Officer Dunn's arrest of Johnson under Florida Statute § 843.02 violated Johnson's Fourth Amendment rights. At the time of Johnson's arrest, a string of controlling cases made clear that police officers may not require identification absent reasonable suspicion of criminality and that "mere words" do not constitute obstruction of officers performing their legal duties under § 843.02. Further, there was no reason to believe that concerns about officer safety at a routine traffic stop would justify requiring passengers unsuspected of wrongdoing to disclose their identities. On these three bases, I would find that "a

26                    WILSON, J., Dissenting                    21-10670

broader, clearly established principle . . . control[s] the novel facts," making it apparent "in the light of pre-existing law" that Officer Dunn's actions were unlawful.  *See Corbitt*, 929 F.3d at 1312.

### A.   Lawful Execution of Any Legal Duty

The first basis on which I would find Johnson's arrest unconstitutional is that Officer Dunn lacked reasonable suspicion of wrongdoing when he required Johnson to disclose his identity.  Supreme Court precedent has consistently required an officer to have a reasonable and articulable suspicion that an individual is involved in criminal activity before requiring identification.

This principle has long been clearly established.  First, that traffic stops are subject to the same rules as *Terry* stops has been clearly established since at least 1984.  *See Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984) ("[T]he usual traffic stop is more analogous to a so-called 'Terry stop,' than to a formal arrest." (internal citation omitted)).  Second, under *Terry*'s progeny—*Brown* and *Hiibel*—it has been clearly established since at least 2004 (if not 1979) that a person cannot be arrested for refusing to identify themselves absent reasonable suspicion.  *See Hiibel*, 542 U.S. at 188 (approving compulsory identification only "in the course of a valid *Terry* stop" and emphasizing that "an officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop") (2004); *Brown*, 443 U.S. at 51–53 (holding that officers could not require an individual who merely "looked suspicious" to identify himself absent "a reasonable suspicion that he was involved in criminal conduct")

(1979).  These decisions, handed down well before Johnson's arrest on August 2, 2018, set forth clearly established law that Johnson could not be arrested for refusing to identify himself where there was no reasonable suspicion that he had committed a crime.

Officer Dunn pushes back on this conclusion, arguing that *Brown* and *Hiibel* could not establish a guiding principle for officers in this particular situation because those cases did not deal with passengers in a lawfully stopped vehicle being asked to identify themselves.  But our qualified immunity jurisprudence "does not require a case directly on point for a right to be clearly established." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)).  A party cannot say that, because we have not yet considered a novel, context-specific exception to the general rule, that the rule itself is not clearly established in that context.  But that is what the majority erroneously does here with little reasoning as to why.

### B.  Officer Safety

The second basis on which I would find Johnson's arrest unconstitutional is that general concerns for officer safety did not justify Officer Dunn's actions.  The default rule is that officers must have reasonable suspicion of criminality to require individuals to identify themselves. *See Brown*, 443 U.S. at 51–52.  However, recognizing the "legitimate and weighty" significance of officer safety and the specific risks to officers created by the unique circumstances of traffic stops, the Supreme Court has determined that it

is constitutionally permissible for police officers conducting traffic stops to take certain precautions. *See Knowles*, 525 U.S. at 117–18.

Nevertheless, the Court has also noted that concerns for officer safety, even in the context of a traffic stop, do not render all additional intrusions into the privacy of vehicle occupants reasonable. Absent suspicion of wrongdoing, the Court has only permitted officers to take some control over passengers' physical movements in order to restrict their ability to do violence or destroy evidence. *See id.* at 117–18; *Wilson*, 519 U.S. at 414; *see also United States v. Lewis*, 674 F.3d 1298, 1306 (11th Cir. 2012) (noting in a case where two individuals in a group of four possessed firearms that "[c]ase precedent from both the Supreme Court and this Circuit has established that, for safety reasons, officers may, in some circumstances, briefly detain individuals about whom they have no individualized reasonable suspicion of criminal activity in the course of conducting a valid *Terry* stop as to other related individuals"). Thus far, the Court has held that further intrusions require reasonable suspicion of wrongdoing or some heightened concern for officer safety. *See Knowles*, 525 U.S. at 117–18. Neither existed here, nor does Officer Dunn claim they did.

In short, although the Supreme Court has identified specific risks inherent in traffic stops and has crafted targeted procedural remedies to address them, the Court has not created the additional broad rule newly proposed by the majority. Instead, the Court has required more to be shown if officers want to justify anything beyond temporarily controlling the physical movements of

passengers.  So, I would find that at the time of Johnson's arrest, it was clear that the boundaries defining permissible police intrusions into passengers' privacy did not extend to cover Officer Dunn's conduct.

### C.  Resist, Obstruct, Oppose

The third basis on which I would find Johnson's arrest unconstitutional is that this court has found, as far back as "[June 2011] it was clearly established that . . . 'mere words' [do] not suffice to provide probable cause for resisting without violence" under Florida Statute § 843.02.  *Alston*, 954 F.3d at 1319.  We have also found that by 2011 it was clearly established that, absent some other form of obstruction, simply declining to cooperate or provide useful information cannot support even arguable probable cause for an arrest under § 843.02.  *Id.*  So here, in August 2018, Officer Dunn lacked even arguable probable cause to arrest Johnson under § 843.02 given that 1) the officers were investigating a traffic offense for which Johnson was not a suspect, 2) Johnson merely explained his rights and declined to provide his name, 3) Officer Ramos told Johnson's father that his identification of his son would suffice, and 4) Officer Dunn then quickly received and verified Johnson's information.

In my view, no "reasonable officer[] in the same circumstances and possessing the same knowledge as [Officer Dunn] could have believed that probable cause existed" for an arrest for obstructing an officer without violence where the detainee was not suspected of wrongdoing, simply declined to provide his name, was

nonetheless quickly and truthfully identified, and was identified in a manner consistent with an officer's instructions. *Hardigree*, 992 F.3d at 1225. Therefore, I agree with the district court below that this arrest violated Johnson's clearly established Fourth Amendment rights.

## V.

The Supreme Court has repeatedly held that reasonable suspicion of criminality is needed before police officers can require individuals to identify themselves. While the Court has found that safety concerns in the unique context of traffic stops justify officers taking certain precautions, it has not yet determined that those concerns warrant eschewing this well-established rule. Given the record in this case, I would decline to depart from that rule today. However, because the facts of this case do not necessitate it, I would go no further than to hold that in the context of a routine traffic stop, it is clear that general safety concerns do not justify officers requiring the names of passengers who are not suspected of any criminality. I would leave for another panel and a different record the question of whether safety concerns at traffic stops can ever reasonably justify such an intrusion. Further, I would hold that at the time of the arrest, it was clearly established that "mere words" do not constitute obstruction or resistance of an officer under Florida Statute § 843.02. Therefore, in my view, Officer Dunn lacked actual and arguable probable cause to arrest Johnson under § 843.02. This arrest, then, violated Johnson's clearly established Fourth Amendment rights.

21-10670                 Wilson, J., Dissenting                 31

Though sincerely appreciative of the risks faced by our law enforcement officers and of the views articulated by my colleagues in the majority, for the reasons above, I would affirm the decision of the district court.